ACCEPTED
05-19-00541-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/16/2019 6:44 PM
LISA MATZ
CLERK

5th Court of Appeals
FILED: 06/18/2019
Lisa Matz, Clerk

# No. 05-19-00541-CV
## In the Fifth District Court of Appeals
## at Dallas, Texas

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
06/17/2019 9:58:00 AM
LISA MATZ
Clerk

## J.A., A MINOR
### *Appellant,*
### v.
## STATE OF TEXAS
### *Appellee.*

On appeal from Cause No. 19M-091
In the County Court at Law, Kaufman County, Texas
Honorable Bobby Rich, Presiding Judge

# APPELLANT'S BRIEF

Respectfully submitted by,

**Tina H. Montoya**
SBN 24039319
**Montoya & Wyble Law, PLLC**
408 W. Nash
Terrell, Texas 75160
Phone: 972-524-3344 • Fax: 972-563-6699
tina@tinamhall.com

### COUNSEL FOR APPELLANT

_____

### ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

**Appellant:**                          **J.A.**
                                        *Defendant*

**Represented in the**                  **Tina H. Montoya**
**Appellate Court by:**                 **TINA H. MONTOYA**
                                        408 W. Nash Street
                                        Terrell, Texas 75160
                                        Phone: 972-524-3344 • Fax: 972-563-6699
                                        Email: tina@montoyawyblelaw.com

**Represented in the**                  **Tina H. Montoya**
**Trial Court by:**                     408 W. Nash Street
                                        Terrell, Texas 75160

**Appellee:**                           **State of Texas**
                                        *Plaintiff*

**Represented in the**                  **Clay Watkins**
**Trial Court by:**                     **Kaufman County District Attorney**
                                        100 W. Mulberry
                                        Kaufman, Texas 75142
                                        Phone: 972-932-4331 • Fax: (972) 932-0357
                                        Clay.Watkins@kaufmancounty.net

# TABLE OF CONTENTS

*Identity of Parties and Counsel* ........................................................................ 2

*Index of Authorities* ...................................................................................... 3-6

*Statement Regarding Oral Argument* ................................................................ 8

*Abbreviations and Record References* .............................................................. 8

*Statement of the Case* .................................................................................... 9

*Issues Presented for Review* ..................................................................... 10-11

APPELLANT'S BRIEF

I.  STATEMENT OF FACTS .......................................................................... 11-13

II.  SUMMARY OF THE ARGUMENT AND STANDARD OF REVIEW ................. 13-19

III.  ARGUMENT ............................................................................................. 19

GENERAL OBJECTION TO THE CLERK'S RECORD .................................................. 19

JURISDICTIONAL AND CONSTITUTIONAL ARGUMENTS ........................................ 20

      1.  **The Trial Court Lacked Jurisdiction over J.A. Because Texas Health & Safety Code Prohibits Minors Being Involuntarily Committed** ................................................................................ **20**

      2.  **J.A.'s Legal Representation did not Meet the Strickland Threshold Committed** .................................................................. **22**

      3.  **The trial court did not comply with Texas Health & Safety Code § 574.012** .................................................................... **29**

**A. ISSUE ONE**................................................................ 31-40

The trial court erred by not dismissing the case in accordance to Texas Health and Safety Code §574.009 because the two medical certificates on file did not comply with Texas Health and Safety Code §574.011.

**B. ISSUE TWO**.................................................................... 41-46

The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness cause *serious harm to herself* because the majority of the expert's testimony regarding a recent act was inadmissible hearsay.

**C. ISSUE THREE**............................................................... 47-60

The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness cause *serious harm to others* because the majority of the expert's testimony regarding a recent act was inadmissible hearsay.

**D. ISSUE FOUR**................................................................ 60-66

The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness, (i) continue to suffer severe and abnormal mental, emotional, or physical distress; (ii) continue to experience substantial mental or physical deterioration of the proposed patient's ability to function independently, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

**PRAYER**...................................................................................... 30

**CERTIFICATE OF COUNSEL REGARDING WORD COUNT**...................................... 68

**CERTIFICATE OF SERVICE** ................................................................. 68

**APPENDIX:**

    **App. A:**    **All Statutes**

# INDEX OF AUTHORITIES

*Case Law***:**

**1.** *Addington v. Texas,* 99 S. Ct., at 1809 ............................................ 38,39

**2.** *Broussard v. State*, 827 S.W.2d 619, 622, 1992 WL 63150 (Tex. App.—Corpus Christi 1992, no writ) ................................................. 65

**3.** *De Jarnett v State,* 732 S.W.2d 346, 349 (Tex.Crim App.1987). ........... 39

**4.** *Humphrey v. Cady*, 92 S. Ct. 1048, 1052, (1972), ............................... 38

**5.** *In re B.A.*, 2016 WL 4628106 (Tex. App.–Tyler Sept. 7, 2016, no pet.) (mem. op.) ..................................................................43,49,62

**6.** *In re C.H.*, 89 S.W.3d 17 (Tex. 2002) ..................................................... 19

7. *In re M.T.*, 2017 WL 1018596 (Tex. App.–Fort Worth Mar. 16, 2017, no pet.) ......................................................................................... 19

8. *In re Breeden,* 4 S.W.3d 782 (Tex.App.-San Antonio 1999, no pet.). 33

**9.** *In re State ex el. J. C*, 2005 WL 1037610(Tex. App.—Tyler May 5, 2005, no pet.) ..................................................................... 33,37

**10.** *J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App—Houston [1st Dist.] 2005, no pet) ................................................................. 37,43,49,62

11. *Marroquinv.State*, 112 S.W.3d 295 (Tex. App.– El Paso 2003, no pet.)

.................................................................................................. 33,37

12. *Parham v. J. R.*, 442 U.S. 584, 602-4 (1979) ........................................ 21

13. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010)..........................42,48,62

14. *State ex rel. E.A.*, 2015 WL 5173036 at *9 (Tex. App.–Houston [14th Dist.] Sept. 3, 2015, no pet.) (mem. op.) ......................................... 33,37

15. *State ex rel. L.A.*, 2015 WL 4381340 at *3–5, (Tex. App.–Texarkana July 17, 2015, no pet.) (mem. op.) ........................................... 35,38,40

16. *State for A.K.*, 2018 WL 1181055, at *4 (Tex. App.—Tyler Mar. 7, 2018, no pet.).................................................................... 37,43,49,62

17. *State for B.A.,* 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) .................................................37,43,49,57,62

18. (*State for G.H.,* 2018 WL 345788, at *7 (Tex. App.—Tyler Jan. 10, 2018, no pet.) ................................................................ 37,43,49,62

19. *State ex rel. S.K.*, 2013 WL 1867626 (Tex. App.—Texarkana May 3, 2013, no pet.).................................................................. 38,43,49,62

20. *State ex rel. C.B.,* 12-11-00089-CV, 2011 WL 3918686 (Tex. App.— Tyler Sept. 7, 2011, no pet.)................................................ 38,43,49,63

21. *State ex rel. S.W., 356 S.W.3d 576 (2011)*........................................ 65

22. *State ex rel.* 2005 WL 1037610(Tex. App.—Tyler May 5, 2005, no pet.) ..................................................................................... 32,36

23. *Strickland v. Washington,* 104 S. Ct. 2052, 2060, (1984)........... 15,22,34

24. *T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.–Dallas 1999, no pet.).et.)49,62

25. *Vitek v. Jones*, 100 S. Ct. 1254, 1263, 63 L. Ed. 2d 552 (1980). .... 38,39

*Statutes***:**

1.   **Texas Health & Safety Code** §572.001(c-1) ..................................... 21

2.   **Texas Health & Safety Code** §573.003(16) ...................................... 13

3.   **Texas Health & Safety Code** §574.009 ...... 16,18,31,32,33,36,37,38,40

4.   **Texas Health & Safety Code** §574.010 .............................................. 24

5.   **Texas Health & Safety Code** §574.011 ......................... 31,32,34,36,40

6.   **Texas Health & Safety Code** §574.012.  ............................... 15,29,30

7.   **Texas Health & Safety Code** §574.004.  .......................15,22,23,24,29

8.   **Texas Health & Safety Code** §574.106(a–1) ................................... 18

9.   **Texas Health & Safety Code** §574.034 ...... 13,18,41,42,47,48,61,62,63

## STATEMENT REGARDING ORAL ARGUMENT

J.A. believes that oral argument is necessary and would assist the Court in making its determination because the issues in this case are complex in that it involves an involuntary commitment for a minor child and the statute is changing September 1,2019, which will greatly affect this child's life.

## ABBREVIATIONS AND RECORD REFERENCES

*Abbreviations***:**

1.  Appellant, J.A. will be referred to as **"J.A."** or **Appellant."**

2.  Appellee, State of Texas will be referred to as **"State"** or **"Appellee."**

*Record References***:**

1.  The Clerk's Record; 1st Supplemental Clerk's Record; 2nd Supplemental Clerk's Record will be referred to as "CR" and "1-SCR" and "2-SCR" respectively, and will be cited by page(s), where applicable. **CR:__**; **1-SCR:__; 2-SCR:__**.

2.  Reporter's Record will be referred to as "RR" and will be cited by page number(s), where applicable. **RR:__**.

3.  Appellant's Appendix will be referred to as "App." and will be cited by tab(s) and page number(s), where applicable. **App.__:__**.

## STATEMENT OF THE CASE

*Nature of the Case***:**   This case involved an involuntary commitment to Terrell State Hospital of a 13 year old child. CR:88

*Proceedings in
the Trial Court***:**   **On May 2, 2019,** the trial court held a hearing on the State's Application for Court-Ordered Mental Health Services. RR:1

*Trial Court Dispositions***:**   **On May 2, 2019** the trial court signed: Judgment No Jury Court Ordered Temporary Mental Health Service In-Patient. CR:97-98.

10

## ISSUES PRESENTED FOR APPEAL

### JURISDICTIONAL AND CONSTITUTIONAL ARGUMENTS

**The Trial Court Lacked Jurisdiction over J.A.**

1. **Texas Health & Safety Code Prohibits Minors Being Involuntarily Committed to InPatient Mental Health Facility**

2. **Hearing Should Not Have Been Held and Case Dismissed**

3. **J.A. Did Not Have Adequate Legal Representation and a Fair Trial**

4. **J.A.'s counsel did not comply with Texas Health & Safety Code § 574.004**

5. **The trial Court did not comply with Texas Health & Safety Code § 574.012**

### ISSUE ONE
The trial court erred by not dismissing the case in accordance to Texas Health and Safety Code §574.009 because the two medical certificates on file did not comply with Texas Health and Safety Code §574.011.

### ISSUE TWO

The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness cause serious harm to herself because the majority of the expert's testimony regarding a recent act was inadmissible hearsay.

### ISSUE THREE
The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness cause serious harm to others because the majori-

11

**ty of the expert's testimony regarding a recent act was inadmissible hearsay.**

**ISSUE FOUR**

**The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness, (i) continue to suffer severe and abnormal mental, emotional, or physical distress; (ii) continue to experience substantial mental or physical deterioration of the proposed patient's ability to function independently, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.**

**APPELLANT'S BRIEF**

Appellant J.A., submits this Appellant's Brief and, as grounds therefore, would show as follows:

**I.**

**STATEMENT OF FACTS**

As a result of a CPS case, Guardian, great aunt, Lou Autry was appointed Sole Managing Conservator of J.A.[1] (RR 11:24 12:1) Guardian, great aunt, Lou Autry voluntarily admitted J.A. to Terrell State Hospital on June

---

[1] The record references Guardian, great aunt, Lou Autry as J.A.'s Guardian, but Guardian, great aunt, Lou Autry does not have Guardianship of the child through a legal proceeding in the Probate Court, instead she has Sole Managing Conservatorship of J.A.

25, 2018 and was discharged by Dr. Sobin on July 13, 2018. (RR 66:2-3) On August 11, 2018, Guardian, great aunt, Lou Autry voluntarily admitted J.A. to Terrell State hospital (TSH) for aggressive behavior against Guardian, great aunt, Lou Autry and J.A.'s sister. (RR 90:2-4) J.A. was raped by her brother between her discharge on July 13, 2018 and readmission August 11, 2018.  J.A. was treated by Dr. Sobin and was diagnosed as having PTSD and DMDD (RR 66:20-25 67:1) On September 10, 2018, Terrell State Hospital discharged J.A. to Waco Youth Center. (RR 66:2-3J.A. was involved in a fight with another patient and a hospital employee was injured during the process of breaking up the fight. (43:11-13)  Guardian, great aunt, Lou Autry was given a choice of taking J.A. home or allowing Waco Youth Center to file an *Application for Court Ordered Mental Health Services*. (RR 43:8-9). On January 11, 2019, J.A. was transported to Terrell Hospital.

Dr. El-Awady began treating J.A. January 11, 2019 and diagnosed her with Disruptive Mood Dysregulation Disorder (DMDD). (RR 17:19). Dr. El-Awady testified that J.A. has angry outbursts that are disproportional to the events causing the outbursts, which is a symptom of DMDD. (RR 22:11-18) J.A. had to be restrained on February 7, 2018 and February 27, 2018. (RR 19:7-19).  J.A. required emergency medication and behavioral interven-

13

tion/redirection from Terrell State Hospital staff on multiple occasions. (RR 28:3-6). On April 1, 2019, J.A. was involved in a fight with another unknown patient. (RR 28:20; RR 31:14). A hospital employee attempted to break up the fight, by restraining J.A. (RR 28:20; RR 31:14). During the restraint, the employee's leg was injured and was sent to the emergency room for treatment. (RR 31:25 32:2).

## II.
### SUMMARY OF THE ARGUMENT

Before a person can be ordered confined to a hospital on a temporary basis, the State must prove by clear and convincing evidence that the proposed patient is mentally ill and also establish at least one of the criteria set forth in Texas Health & Safety Code §574.034(a)(2). The trial court rendered a judgment that J.A. has a mental illness as defined by Texas Health & Safety Code §573.003(16) and is likely to cause serious harm to herself or others and has severe and abnormal mental, emotional, or physical distress, her inability to provide for her basic needs or make an informed decision about whether to submit to treatment. TEX. HEALTH & SAFETY CODE §574.034(a)(2). J.A. asserts, the trial court did not have jurisdiction to hear the case, but even if it did, the State did not prove by clear and convincing

14

evidence that 1) J.A.is likely to cause serious harm to herself; 2) J.A. is likely to cause serious harm to herself; 3) J.A. is experiencing substantial mental or physical deterioration of her ability to function independently, which is exhibited by her inability, to provide for the proposed patient's basic needs, including food, clothing, health, or safety.

**1. The Trial Court Lacked Jurisdiction over J.A. Because Texas Health & Safety Code Prohibits Minors Being Involuntarily Committed**

Texas law does not allow a minor to be involuntarily committed to an inpatient mental health facility. The Texas Health and Safety Code instead only allows for the voluntary admission of a minor to an inpatient mental health facility

J. A. is a minor. .(CR:48-49) Where no statute provides for the involuntary commitment of a minor to a mental health facility, the trial court lacked jurisdiction to involuntarily commit J.A. to an inpatient psychiatric facility. Therefore, the trial court erred in committing J.A. to Terrell State Hospital for no more than 90 days and the judgment should be reversed.

**2. J.A.'s Legal Representation did not Meet the Strickland Threshold**

15

Because J.A. was being involuntarily committed to Terrell State Hospital (TSH) and potentially losing her right to liberty, under the Sixth Amendment, J.A. was entitled to effective trial counsel. *Strickland v. Washington,* 466 U.S. at 688 (1984) Because J.A.'s trial counsel was not able to perform all of the duties required under Texas Health & Safety Code §574.004, J.A.'s representation did not meet the Strickland threshold.

## 2. The trial Court did not comply with Texas Health & Safety Code § 574.012

J.A.'s counsel attempted to put on testimony regarding the least restrictive means of treatment, but the trial court did not want to hear the testimony. (RR 56:23; 57; 58; 84:24-25; 96) The delicate facts and circumstances of this case, makes this statute even more important for the Court to follow its statutory duty so that the court could have determined if there was a lesser restrictive means for this child. Therefore, the trial court failing to complete his duties has resulted in harmful error to J.A. and the trial court erred in committing J.A. to Terrell State Hospital for no more than 90 days and the judgment should be reversed.

## 3. Hearing Should Not Have Been Held and Case Dismissed

Texas Health and Safety Code §574.009(a) mandates that a hearing

16

"may not be held unless there are on file with the court at least two certificates of medical examination for mental illness completed by different physicians each of whom has examined the proposed patient during the preceding 30 days." TEX. HEALTH & SAFETY CODE §574.009(a) Subsection (d) of §574.009 Texas Health and Safety Code states "if the certificates required under this section are not on file at the time set for the hearing on the application, the judge shall dismiss the application and order the immediate release of the proposed patient if that person is not at liberty." TEX. HEALTH & SAFETY CODE §574.009(d).

Dr. El-Awady's CME was deficient because, *inter alia*, No. 7 on his CME should have had specific facts of recent examples of how J.A. was 1) **likely to cause harm to herself; 2) likely to cause harm to others; or 3) continue to suffer severe and abnormal mental, emotional, or physical distress and continue to deteriorate in her ability to function independently and unable to make a rational and informed decisions as to submit to treatment. (CR:92-95)** But instead there are only conclusory statements without any facts or dates of J.A.'s alleged behavior: "patient has been aggressive" "repeated EMI" "placed in restraint" "patient not taking any responsibility for her actions." (CR:92-95) If being "aggressive" and "not

17

taking responsibility for actions is enough to request a hearing to involuntarily commit a person and force them to accept mental health treatment, many people in Texas should be committed to Terrell State Hospital, J.A.'s counsel included.

Dr. Sobin's CME was deficient because, *inter alia*, No. 7 on his CME should have had specific facts of recent examples of how J.A. was 1) **likely to cause harm to herself; 2) likely to cause harm to others; or 3) continue to suffer severe and abnormal mental, emotional, or physical distress and continue to deteriorate in her ability to function independently and unable to make a rational and informed decisions as to submit to treatment. (CR:92-95)** But instead there are only conclusory statements, without any facts or dates of J.A.'s alleged behavior: "Jocelyn has an extensive history of severe aggression" "has tried to harm herself" "has not responded to treatment." (CR:92-95)  Again, these conclusory statements could describe many Texans And if these conclusory statements are deemed "enough facts/evidence" to request a hearing to have a person involuntarily committed to a mental health facility, doctors become too powerful and can have anyone involuntarily committed and forced to accept mental health treatment.

18

Because the CME's were deficient, *inter alia*, for not stating the specific facts supporting the doctor's opinion and those deficiencies were therefore equivalent to not having CME's on file at all. Because the CME's did not comply with TEX. HEALTH & SAFETY CODE §574.009(a)(d), for not having sufficient facts supporting Dr. El-Awady and Dr. Sobin's opinion, the trial court should have dismissed the case. In this case, the CME's did not comply with the statute and caselaw referenced above and therefore the trial court erred by not dismissing the case and immediately releasing J.A.

## STANDARD OF REVIEW

The State's burden of proof in an *Application for Court Ordered Mental Health Services* is clear and convincing evidence. *See* Tex. Health & Safety Code §§ 574.034(a), 574.106(a–1). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010) In reviewing evidence for legal sufficiency, under a clear and convincing standard, the Court must review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* The Court should resolve disputed

19

fact questions in favor of the finding if a reasonable factfinder could have done so, and should disregard all contrary evidence unless a reasonable fact-finder could not have done so. *Id.*

When evaluating the factual sufficiency of the evidence under the clear and convincing standard, the Court should view all of the evidence in a neutral light and determine whether a reasonable fact-finder could form a firm belief or conviction that a given finding was true.  *See In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002); *In re M.T.*, 2017 WL 1018596, at *5 (Tex. App.–Fort Worth Mar. 16, 2017, no pet.)

## III.
### ARGUMENT

### GENERAL OBJECTION TO THE CLERK'S RECORD

J.A. hereby informs the Court that the Clerk's Record is inaccurate and portions of the Clerk's Record should be removed or not considered in this appeal because the documents were not entered into evidence at trial.  The documents that were filed in the Clerk's Record from (CR:6-47) were in violation of the Health Insurance Portability and Accountability Act of 1996 and without J.A.'s consent and obtained without a valid subpoena.[2] (CR:1-103)

---

[2] J.A.'s Counsel did not find a subpoena in the Clerk's Record

20

Further, the State did not serve J.A.'s counsel with the documents upon filing the documents in the Clerk's Record. In fact, J.A.'s counsel had to request every document that she received in this case. It appears the State is attempting to have this Court review evidence that was not before the trial court and J.A. prays this Court will not review the Clerk's Records from page 6 through page 47 to make its ruling.[3]

1. **The Trial Court Lacked Jurisdiction over J.A. Because Texas Health & Safety Code Prohibits Minors Being Involuntarily Committed**

Texas law does not allow a minor to be involuntarily committed to an inpatient mental health facility. The Texas Health and Safety Code instead only allows for the voluntary admission of a minor to an inpatient mental health facility

**Applicable Law**

Title 7, Subtitle C of the Texas Health and Safety Code governs the commitment and admission of individuals to inpatient mental health facilities, which does not grant the trial court jurisdiction to hold a hearing or order a minor involuntarily committed to an inpatient mental health facility.

Chapter 572 of the Health & Safety Code explicitly states "[a] minor younger than 18 years of age *may not be involuntarily committed* unless pro-

---

[3] J.A.'s counsel believes J.A.'s case was prejudiced by the State filing those documents in the Clerk's Record and the State was attempting to circumvent the Texas Rules of Evidence by filing the documents (CR:6-47)

vided by this chapter, other state law, or department rule." TEX. HEALTH & SAFETY CODE §572.001(c-1)(emphasis added). There is nothing in Chapter 572 that provides for involuntary commitment, the entire chapter deals only with voluntary admissions to inpatient mental health facilities. No department rule or other state law explicitly discusses the involuntary commitment of a minor.

Section 572.001(c-1) has been amended by Senate Bill 1238, which passed during the 2019 legislative session, clarifying that minors shall not be involuntarily committed to inpatient mental health facilities unless provided by department rule, or under Chapter 55 of the Family Code. *See* Acts 2019, 86th Leg., S.B. 1238, § 2, eff. Sept. 1, 2019. The reasoning behind this statutory provision is reasonable. Parents and guardians retain a substantial, if not the dominant, role in medical decision making, which includes the decision to institutionalize their child, and that the traditional presumption that the parents and guardians act in the best interests of their child. *Parham v. J. R.*, 442 U.S. 584, 602-4 (1979)

**Facts and Legal Argument**

J. A. is a minor.(CR:48-49) Where no statute provides for the involuntary commitment of a minor to a mental health facility, the trial court lacked

22

jurisdiction to involuntarily commit J.A. to an inpatient psychiatric facility. Therefore, the trial court erred in committing J.A. to Terrell State Hospital for no more than 90 days and the judgment should be reversed.

## 2. J.A.'s Legal Representation did not Meet the Strickland Threshold

Because J.A. was being involuntarily committed to Terrell State Hospital (TSH) and potentially losing her right to liberty, under the Sixth Amendment, J.A. was entitled to effective trial counsel. *Strickland v. Washington,* 466 U.S. at 688 (1984) Because J.A.'s trial counsel was not able to perform all of the duties required under Texas Health & Safety Code §574.004, J.A.'s representation did not meet the Strickland threshold.

**Applicable Statutory Law**

Sec. 574.004. DUTIES OF ATTORNEY. (a) An attorney representing a proposed patient shall interview the proposed patient within a reasonable time before the date of the hearing on the application.

(b) The attorney shall thoroughly discuss with the proposed patient the law and facts of the case, the proposed patient's options, and the grounds on which the court-ordered mental health services are being sought. A court-appointed attorney shall also inform the proposed patient that the proposed patient may obtain personal legal counsel at the proposed patient's expense instead of accepting the court-appointed counsel.

(c) The attorney may advise the proposed patient of the wisdom of agreeing to or resisting efforts to provide mental health services, but the proposed patient shall make the decision to agree to or resist the efforts. Regard-

less of an attorney's personal opinion, the attorney shall use all reasonable efforts within the bounds of law to advocate the proposed patient's right to avoid court-ordered mental health services if the proposed patient expresses a desire to avoid the services. If the proposed patient desires, the attorney shall advocate for the least restrictive treatment alternatives to court-ordered inpatient mental health services.

(d) Before a hearing, the attorney shall:

(1) review the application, the certificates of medical examination for mental illness, and the proposed patient's relevant medical records;

(2) interview supporting witnesses and other witnesses who will testify at the hearing; and

(3) explore the least restrictive treatment alternatives to court-ordered inpatient mental health services.

(e) The attorney shall advise the proposed patient of the proposed patient's right to attend a hearing or to waive the right to attend a hearing and shall inform the court why a proposed patient is absent from a hearing.

(f) The attorney shall discuss with the proposed patient:

(1) the procedures for appeal, release, and discharge if the court orders participation in mental health services; and

(2) other rights the proposed patient may have during the period of the court's order.

(g) To withdraw from a case after interviewing a proposed patient, an attorney must file a motion to withdraw with the court. The court shall act on the motion as soon as possible. An attorney may not withdraw from a case unless the withdrawal is authorized by court order.

(h) The attorney is responsible for a person's legal representation until:

(1) the application is dismissed;

(2) an appeal from an order directing treatment is taken;

(3) the time for giving notice of appeal expires by operation of law; or

(4) another attorney assumes responsibility for the case.

TEX. HEALTH & SAFETY CODE §574.004

Sec. 574.010. INDEPENDENT PSYCHIATRIC EVALUATION AND EXPERT TESTIMONY. (a) The court may order an independent evaluation of the proposed patient by a psychiatrist chosen by the proposed patient if the court determines that the evaluation will assist the finder of fact. The psychiatrist may testify on behalf of the proposed patient.

(b) If the court determines that the proposed patient is indigent, the court may authorize reimbursement to the attorney ad litem for court-approved expenses incurred in obtaining expert testimony and may order the proposed patient's county of residence to pay the expenses.

TEX. HEALTH & SAFETY CODE §574.010

**Facts and Legal Argument**

J.A.'s counsel, Tina Montoya,[4] (Montoya) had a duty to conduct a reasonably substantial and "independent examination of the facts, circumstances, pleadings and laws involved." *Strickland v. Washington,* 466 U.S. at 688 (1984). In order to do this, Montoya was required to read Texas Health & Safety Code §574.004 that outlines her duties in representing a mental health patient, the pertinent portions of the statute are as follows:

d) Before a hearing, the attorney shall:
(1) review the application, the certificates of medical examination for mental illness, and the proposed patient's relevant medical records;
(2) interview supporting witnesses and other witnesses who will testify at the hearing; and
(3) explore the least restrictive treatment alternatives to court-ordered inpatient mental health services.

---

[4] J.A.'s trial and appellate counsel is Tina Montoya

**1. J.A. was not adequately represented in accordance to the Strickland requirements because TSH refused to provide J.A.'s counsel with all of her hospital and physician's records.**

Tina Montoya received notice on April 2, 2019 that she was court appointed to represent J.A. and that a hearing was set April 4, 2019. Montoya requested a continuance under Texas Health & Safety Code §574.005 because the *Certificates of Medical Examinations* had been on file for less than 3 days.(CR:48-49). The case was reset to April 18, 2019. (CR:50) J.A.'s counsel requested a continuance under Texas Health & Safety Code §574.005 because the doctor J.A.'s counsel was going to hire, was not available to testify on April 18, 2019. (CR:60-61) The prosecutor and J.A.'s counsel agreed to continue the hearing again until May 2, 2019. (CR:62)

Montoya sent a subpoena duces tecum to both Terrell State Hospital (TSH) and Waco Youth Center's custodian of records, on April 8, 2019 and April 9, 2019. (CR:73-76) TSH's lawyer, Tina Carnes, used various sections in the Texas Health and Safety Code to prevent Montoya from obtaining all of J.A.'s hospital records, stating she was only entitled to some of J.A.'s medical records. (CR:67-77) Montoya explained to Carnes that Under Texas Health & Safety Code §574.003(c), Montoya was entitled to "have access to all hospital and physician's records." (CR:71) *See* TEX.HEALTH & SAFE-

26

TY CODE §574.003(c). Carnes responded with "I am not sure that chapter 574 speaks to release of records, but the duty of the attorney when representing the client." (CR:70) Several emails were sent to Carnes attempting to obtain those medical records. (CR:70-72) In one email Carnes threatened Montoya with further legal action. (CR:72) Specifically, Carnes said "The records will also be released for that sole purpose and if used for any other purpose will result in further action, up to and including notification to U.S.H.H.S. Office of Civil Rights and the court (for additional legal action)." (CR:72) Montoya finds it disturbing that 1) TSH provided the State with some of J.A.'s medical records, in violation of HIPPA, but Montoya, never received those medical records; 2) J.A.'s medical records were filed in the Clerk's file without notice to Montoya, in violation of Texas Rules of Civil Procedure 21, and where the trial court Judge would have access to read J.A.'s medical records that were never entered into evidence.[5] (CR:6-47) Carnes went on to make another threat to Montoya about contacting the trial court. (CR:72) Specifically, Ms. Carnes said ". . .Your client has already been delayed for a month in getting that treatment due to your representation. Further delay will be communicated to the court." (CR:72) On April 16, 2019, I filed a Motion

---

[5] I have been practicing in front of the trial court Judge for several years and he is always prepared for court.

for Court to Order the Release of Patient's Records & In the Alternative Motion for Guardian Ad Litem.[6] (CR:67-77)(CR: 99)

> **2. J.A. was not adequately represented in accordance to the Strickland requirements because she did not have a Guardian Ad Litem appointed or the opportunity for an Independent Psychiatric Evaluation.**

Montoya also requested that the guardian, great aunt, Lou Autry, sign the HIPPA release so TSH would release all of J.A.'s hospital and physician's records and so that J.A. could have an independent evaluated by another physician.[7] (CR:67-77) TSH would not allow J.A. to be evaluated by another physician without the guardian's signature. (CR:67-77) Montoya could not get a ruling from the Court on that Motion prior to May 2, 2019 hearing.[8] Carnes agreed to have TSH provide Montoya with limited medical records and directed me to Venonia Arnold, who then indicated she was the custodian of records, although her signature block says different. (CR:77)

---

[6] On April 4, 2019, J.A.'s counsel made an oral Motion for the Court to Appoint a Guardian Ad Litem for the child, but the prosecution objected and Court denied the Motion. J.A.'s counsel did not request the Reporter's Record for the April 4, 2019 hearing.

[7] In 15 years of representing TSH patient's, I've never requested an Independent Psychiatric Evaluation, but with this case it is necessary.

[8] The Prosecutor went on vacation on April 16, 2019 and did not return until April 29, 2019 and the Judge was out of the office until May 1, 2019. Therefore J.A.'s counsel could not get a hearing scheduled in time before the May 2, 2019 hearing.

You will notice at the bottom of Venonia Arnold's email that Carnes sent her a message that says "your turn."(CR:77). [9]

On May 2, 2019, the day of the hearing, I scheduled to meet with J.A. at 12:00 p.m., like I had been doing for weeks, but when I arrived, TSH refused to bring J.A. to Court until right before court began, J.A., the 13-year-old child, did not testify. (RR 75:3-7)[10]

J.A. needed to have a Guardian Ad Litem appointed to help J.A.'s counsel to 1) make decisions regarding her case, 2) give permission to sign a HIPPA form and 3) give permission to have the Independent Psychiatric Evaluation completed. Montoya believes, after speaking with the expert who was going to be hired to conduct the evaluation, that based on his testimony and other mitigating factors, the result would have been different and J.A. would not have been involuntarily committed to Terrell State Hospital. As determined by the Supreme Court:

> That a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to pro-

---

[9] Montoya did not have the same problem with Waco Youth Center, she received all of their records.

[10] There is an error in the reporter's record that says "I visited with my client at noon" and what I said was "I was supposed to visit with my client at noon"

duce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Strickland*, 466 U.S. at 685. The Sixth Amendment guarantee of effective assistance of counsel assumes that the appointed counsel will provide counsel sufficient to make the trial a reliable adversarial testing process. *Id*. Montoya did not complete all of her duties required by the statute. See TEX. HEALTH & SAFETY CODE §574.004.

Montoya needed all of J.A.'s hospital and physician's records to properly represent J.A. and she needed an Independent Psychiatric Evaluation. If Montoya had been able to review all of the all hospital and physician's records and hire an expert to conduct the Independent Psychiatric Evaluation, the result more than likely would have been different. Therefore, Montoya not fulfilling her duties as J.A.'s court appointed counsel, resulted in harmful error and the judgment should be reversed.

## 3. The trial court did not comply with Texas Health & Safety Code § 574.012

Under Texas Health and Safety Code §574.012, the trial court was required to "direct the local mental health authority to file, before the date set

for the hearing, its recommendation for the proposed patient's treatment."

TEX. HEALTH & SAFETY CODE §574.012

**Applicable Law**

Sec. 574.012.  RECOMMENDATION FOR TREATMENT.  (a)  The local mental health authority in the county in which an application is filed shall file with the court a recommendation for the most appropriate treatment alternative for the proposed patient.

(b)  The court **shall** direct the local mental health authority to file, before the date set for the hearing, its recommendation for the proposed patient's treatment.

(c)  If outpatient treatment is recommended, the local mental health authority will also file a statement as to whether the proposed mental health services are available.

(d)  The hearing on an application may not be held before the recommendation for treatment is filed unless the court determines that an emergency exists.

(e)  This section does not relieve a county of its responsibility under other provisions of this subtitle to diagnose, care for, or treat persons with mental illness.

(f)  This section does not apply to a person for whom treatment in a private mental health facility is proposed.

TEX. HEALTH & SAFETY CODE §574.012

**Facts and Legal Argument**

J.A.'s counsel attempted to put on testimony regarding the least restrictive means of treatment, but the trial court did not want to hear the testimony. (RR 56:23; 57; 58; 84:24-25; 96)  The delicate facts and circumstances of this case, makes this statute even more important for the Court to follow its statu-

31

tory duty so that the court could have determined if there was a lesser restrictive means for this child. Therefore, the trial court failing to complete his duties has resulted in harmful error to J.A. and the trial court erred in committing J.A. to Terrell State Hospital for no more than 90 days and the judgment should be reversed.

**A. Issue One.**

> **The trial court abused its discretion by not dismissing the case in accordance to Texas Health and Safety Code §574.009 because the two medical certificates on file did not comply with Texas Health and Safety Code §574.011.**

**Applicable Statutory Law**

Texas Health and Safety Code §574.009(a) mandates that a hearing "may not be held unless there are on file with the court at least two certificates of medical examination for mental illness completed by different physicians each of whom has examined the proposed patient during the preceding 30 days." TEX. HEALTH & SAFETY CODE §574.009(a) Subsection (d) of §574.009 Texas Health and Safety Code states "if the certificates required under this section are not on file at the time set for the hearing on the application, the judge shall dismiss the application and order the immediate release of the proposed patient if that person is not at liberty." TEX. HEALTH &

SAFETY CODE §574.009(d).

Texas Health and Safety Code §574.011 mandates that the Certificate of Medical Examination for Mental Illness **must include**:

(1)  the name and address of the examining physician;

(2)  the name and address of the person examined;

(3)  the date and place of the examination;

(4)  a brief diagnosis of the examined person's physical and mental condition;

(5)  the period, if any, during which the examined person has been under the care of the examining physician;

(6)  an accurate description of the mental health treatment, if any, given by or administered under the direction of the examining physician; and

(7)  the examining physician's opinion that:

(A)  the examined person is a person with mental illness; and

(B)  as a result of that illness the examined person is likely to cause serious harm to the person or to others or is:

(i)  suffering severe and abnormal mental, emotional, or physical distress;

(ii)  experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii)  not able to make a rational and informed decision as to whether to submit to treatment.

TEX. HEALTH & SAFETY CODE §574.011.

**Applicable Case Law**

The statutory requirements for an involuntary commitment are strict because an involuntary commitment is a drastic measure. *State ex rel.* 2005

WL 1037610, at *4 (Tex. App.—Tyler May 5, 2005, no pet.) *Citing, In re Breeden,* 4 S.W.3d 782, 789 (Tex.App.-San Antonio 1999, no pet.). Several appellate courts across Texas have ruled that a trial court should dismiss *Applications for Court Ordered Mental Health* Service if the CME's on file are not in strict compliance with Texas Health & Safety Code §574.009(d)*. see, e.g., State ex rel. E.A.,* 2015 WL 5173036 at *9 (Tex. App.–Houston [14th Dist.] Sept. 3, 2015, no pet.) (mem. op.) ("Because two certificates of medical examination for mental illness were not on file at the time the application hearing was set as required by section 574.009, the trial court should have dismissed the application."); *State ex rel. L.A.*, 2015 WL 4381340 at *3–5, (Tex. App.–Texarkana July 17, 2015, no pet.) (mem. op.) (concluding that trial court erred in conducting commitment hearing because one of certificates on file was stale: the physician had not examined the proposed patient within 30 days of hearing); *Marroquin v. State*, 112 S.W.3d 295, 303–04 (Tex. App.–El Paso 2003, no pet.) (concluding that conducting commitment hearing "with only one proper certificate on file was harmful error") *In re State ex el. J. C*, 2005 WL 1037610, at *4 (Tex. App.—Tyler May 5, 2005, no pet.) (ruling that Dr. Plyler's certificate did not conform to the statutory requirements, and the trial court erred in conducting a hearing on the applica-

34

tion for court-ordered temporary mental health services and entering an order of commitment.)

**Facts**

On April 2, 2019, the State filed an *Application for Court Ordered Mental Health Services* and two *Physician's Certificate of Medical Examination for Mental Illness* completed by Dr. El-Awady and Dr. Sobin to begin the process of involuntarily committing J.A. to Terrell State Hospital.[11] (CR 90) On April 29, 2019, the State filed the same two *Physician's Certificate of Medical Examination for Mental Illness* that were completed on April 2, 2019. (CR 92-94) However, J.A.'s counsel was never served a copy of the April 29, 2019 filings. (RR 9:25; RR 10:1) At the May 2, 2019 hearing, J.A.'s counsel objected to both Dr. El-Awady and Dr. Sobin's Certificates of Medical Examination ("CME's") complaining that the CME's did not comply with Texas Health and Safety Code §574.011 requirements. (RR 4:7-14)

Dr. El-Awady's CME was deficient because, *inter alia*, No. 7 on his CME should have had specific facts of recent examples of how J.A. was 1) **likely to cause harm to herself; 2) likely to cause harm to others; or 3)**

---

[11] The Clerk's Record does not have the CME's that were filed on April 2, 2019 that began the original mental health commitment hearing, a quick review during the hearing revealed the CME's filed on April 29, 2019 were identical to the April 2, 2019.

**continue to suffer severe and abnormal mental, emotional, or physical distress and continue to deteriorate in her ability to function independently and unable to make a rational and informed decisions as to submit to treatment. (CR:** But instead there are only conclusory statements without any facts or dates of J.A.'s alleged behavior: "patient has been aggressive" "repeated EMI" "placed in restraint" "patient not taking any responsibility for her actions." (CR: If being "aggressive" and "not taking responsibility for actions is enough to request a hearing to involuntarily commit a person and force them to accept mental health treatment, many people in Texas should be committed to Terrell State Hospital, J.A.'s counsel included.

Dr. Sobin's CME was deficient because, *inter alia*, No. 7 on his CME should have had specific facts of recent examples of how J.A. was 1) **likely to cause harm to herself; 2) likely to cause harm to others; or 3) continue to suffer severe and abnormal mental, emotional, or physical distress and continue to deteriorate in her ability to function independently and unable to make a rational and informed decisions as to submit to treatment. (CR:** But instead there are only conclusory statements, without any facts or dates of J.A.'s alleged behavior: "Jocelyn has an extensive history of severe aggression" "has tried to harm herself" "has not responded to treat-

36

ment." (CR: Again, these conclusory statements could describe many Texans And if these conclusory statements are deemed "enough facts/evidence" to request a hearing to have a person involuntarily committed to a mental health facility, doctors become too powerful and can have anyone involuntarily committed and forced to accept mental health treatment.

**Law Applied to Facts**

## 1. CME's Did Not Comply with TEX. HEALTH & SAFETY CODE §574.009(a)(d).

Because the CME's were deficient, *inter alia,* for not stating the specific facts supporting the doctor's opinion and those deficiencies were therefore equivalent to not having CME's on file at all. (CR: J.A.'s Counsel argued that the trial court should not hold a hearing because 1) the CME's did not strictly comply with Texas Health and Safety Code §574.009(a)(d); 2) the trial court did not have jurisdiction to hear the case without the CME's being on file at the time set for the hearing; and 3) the trial court should dismiss the case in accordance to Texas Health and Safety Code §574.011.[12] (RR: *State ex rel.* 2005 WL 1037610, at *4 (Tex. App.—Tyler May 5, 2005, no pet.)

---

[12] In full disclosure, the undersign admits that the caselaw on this issue is not settled law as many cases have ruled that not having the CME's on file are not jurisdictional, but that does not negate the Judge's requirement to follow the statute and dismiss the case regardless if this Court see's the deficiencies in the CME's are jurisdictional or not.

*State ex rel. E.A.*, 2015 WL 5173036 at *9 (Tex. App.–Houston [14th Dist.] Sept. 3, 2015, no pet.) (mem. op.); *State ex rel. L.A.*, 2015 WL 4381340 at *3–5, (Tex. App.–Texarkana July 17, 2015, no pet.) (mem. op.); *Marroquin v. State*, 112 S.W.3d 295, 303–04 (Tex. App.–El Paso 2003, no pet.); *and In re State ex el. J. C*, 2005 WL 1037610, at *4 (Tex. App.—Tyler May 5, 2005, no pet.)

## 2. The CME's Did Not Comply with TEX. HEALTH & SAFETY CODE §574.009(a)(d) because they were not supported by facts of J.A.'s Specific Behavior.

Because the CME's did not comply with TEX. HEALTH & SAFETY CODE §574.009(a)(d), for not having sufficient facts supporting Dr. El-Awady and Dr. Sobin's opinion, the trial court should have dismissed the case. The *Tyler Court of Appeals* stated "An expert opinion recommending commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria. What is necessary is the expert's description of the patient's specific behaviors on which the expert's opinion is based." *State for B.A.,* 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) (*Citing J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App—Houston [1st Dist.] 2005, no pet) *See also, State for A.K.,* 2018 WL 1181055, at *4 (Tex. App.—Tyler Mar. 7, 2018, no pet.); (*State for G.H.,* 2018 WL

38

345788, at *7 (Tex. App.—Tyler Jan. 10, 2018, no pet.); *State ex rel. S.K.*, 2013 WL 1867626, at *3 (Tex. App.—Texarkana May 3, 2013, no pet.); *State ex rel. C.B.,* 12-11-00089-CV, 2011 WL 3918686, at *4 (Tex. App.—Tyler Sept. 7, 2011, no pet.)

### 3. Because the CME's Did Not Comply with TEX. HEALTH & SAFETY CODE §574.009(a)(d) this Appeal Should Be Reversed Without Further Analysis.

Most if not all of the cases cited above in subsection 2, went on to review the entire record to determine if the evidence was legally and factually sufficient to support the judgment itself, instead of dismissing the case as required by Texas Health & Safety Code §574.009(d). The provision that two certificates must be on file at the time of the hearing is mandatory. *State ex rel L.A.,* 2015 WL 4381340, at *1 (Tex.App.–Texarkana July 17, 2015, no pet.) (mem. op.).

The United States Supreme Court in *Vitek v. Jones*, recognized that for the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty," *Humphrey v. Cady*, 92 S. Ct. 1048, 1052, (1972), and in consequence "requires due process protection." *Addington v. Texas*, 99 S.Ct. 1804, 1809, (1979); *O'Connor v. Donaldson*, 95 S.Ct. 2486, 2496, (1975). The loss of liberty produced by an involuntary commitment is more

than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Addington v. Texas,* 99 S. Ct., at 1809. *Vitek v. Jones*, 100 S. Ct. 1254, 1263, 63 L. Ed. 2d 552 (1980).

J.A.'s involuntary commitment to Terrell State Hospital is a direct attack on her constitutional right of not being deprived of liberty without due course of law under the Texas Constitution and due process of the law under the United States Constitution. TEX. CONST. ART. I, § 19 AND U.S. CONST. AMEND. XIV, § 1 To that end, the statutory requirement of two CME's to be "on file at the time set for the hearing on the application" is equivalent to the requirement of the police being required to obtain a warrant prior to arresting a person. As a general rule, police officers must always get an arrest warrant before taking someone into custody.[13]

*arnett v. State,* 732 S.W.2d 346, 349 (Tex.Crim.App.1987). Similarly, the State must file two CME's that are sworn under oath and contain detailed

---

[13] There are exceptions to arrest warrant requirements, but those exceptions are not relevant to illustrate to this Court the similarities in the requirement of two CME's and an arrest warrant.

facts to explain the doctor's opinion. TEX. HEALTH & SAFETY CODE §574.009 and §574.011.

A mental health commitment hearing is civil in nature, but because one's liberty is going to be deprived, the protections afforded a defendant in a criminal case should be equally available to a mental health patient who is at risk of being confined against her will. If this Court declines to dismiss this case and moves forward with reviewing the entire record to determine if the evidence is legally or factually sufficient, the Court is essentially allowing J.A. to continue to be confined in Terrell State Hospital without due process of the law. The two CME's required to be on file at the time set for the hearing on the application, is the due process element that prevents the State from rounded up persons on the street and confining them to a mental facility without good cause. That good cause being the requirement of two CME's to be on file at the time set for the hearing on the application.

**Conclusion**

In this case, the CME's did not comply with the statute and caselaw referenced above and therefore the trial court erred by not dismissing the case and immediately releasing J.A. Therefore, the trial court's judgment should be reversed.

41

**B. Issue Two.**

**The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness cause *serious harm to herself* because the majority of the expert's testimony regarding a recent act was inadmissible hearsay.**

**Applicable Statutory Law**

Before a person can be ordered confined to a hospital on a temporary basis, the State must prove by clear and convincing evidence that the proposed patient is mentally ill and also establish at least one of the criteria set forth in Texas Health & Safety Code §574.034(a)(2). Texas Health & Safety Code §574.034(a)(2) states as follows:

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is a person with mental illness; and
(2) as a result of that mental illness the proposed patient:
    (A) is likely to cause serious harm to the proposed patient;
    (B) is likely to cause serious harm to others; or
    (C) is:
        (i) suffering severe and abnormal mental, emotional, or physical distress;
        (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii)  unable to make a rational and informed decision as to whether or not to submit to treatment.

Texas Health & Safety Code §574.034(d) states as follows:

(d)  To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:
(1)  the likelihood of serious harm to the proposed patient or others;  or
(2)  the proposed patient's distress and the deterioration of the proposed patient's ability to function.

TEX. HEALTH & SAFETY CODE §574.034(d)

**Applicable Case Law**

J.A. can only be involuntarily committed to TSH if the State proves by clear and convincing evidence that J.A. is mentally ill and also establish at least one of the additional criteria set forth in section 574.034(a)(2). *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2).  In accordance to Texas Health & Safety Code 574.034(b), the State must present evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: the likelihood of serious harm to the proposed patient.  The Texas Supreme Court in *State v. K.E.W.,* 315 S.W.3d 16, 24, 53 Tex. Sup. Ct. J. 969, 2010 WL 2635981 (Tex. 2010) held that the expressed standard requires that the overt

act or pattern of conduct be "to some degree probative of a finding that serious harm to others is *probable* if the person is not treated."

Expert testimony confirming mental illness, standing alone, will not support an involuntary commitment. *In re B.A.*, 2016 WL 4628106, at *3 (Tex. App.–Tyler Sept. 7, 2016, no pet.) (mem. op.); *see T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.–Dallas 1999, no pet.). The *Tyler Court of Appeals* stated "An expert opinion recommending commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria. What is necessary is the expert's description of the patient's specific behaviors on which the expert's opinion is based." *State for B.A.*, 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) (*Citing J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App—Houston [1st Dist.] 2005, no pet) *See also, State for A.K.*, 2018 WL 1181055, at *4 (Tex. App.—Tyler Mar. 7, 2018, no pet.); (*State for G.H.,* 2018 WL 345788, at *7 (Tex. App.—Tyler Jan. 10, 2018, no pet.); *State ex rel. S.K.*, 2013 WL 1867626, at *3 (Tex. App.—Texarkana May 3, 2013, no pet.); *State ex rel. C.B.,* 12-11-00089-CV, 2011 WL 3918686, at *4 (Tex. App.—Tyler Sept. 7, 2011, no pet.).

**Facts**

Dr. El-Awady was the State's only witness at J.A.'s hearing. (RR 1-64) Dr. El-Awady's testimony was nothing more than describing how any child would react that has been in and out of CPS's custody and abused and neglected by the people who were charged with protecting her from being repeatedly raped, and then blaming her for not doing more to prevent the rape. RR )[14](RR 56:14-25; (RR 61:20-25) (RR 62:1). And shortly thereafter, J.A. was mistreated in TSH in that she was required to sit in a chair for 12 hours during "TSP punishment" on several occasions.[15] (RR44:14-25; 45; 46:1-18) Dr. El-Awady's testimony about a a recent act or pattern of behavior did not include specific facts and dates to prove that the alleged acts are recent. Most of Dr. El-Awady's testimony was not within his personal knowledge and in admissible hearsay and therefore should not have been considered by the court.

**Dr. El-Awady's Direct Examination-Self Harm:**

MR. WATKINS: Q. In your opinion as a result of the mental illness, is the patient likely to cause serious harm to herself?

---

[14] The therapy notes received from TSH for treatment between January 2019 through March 2019 indicated absolutely no treatment for the rape other than a notation in January 2019 by Dr. Kennedy that said "J.A. regrets not doing more to prevent the rape."

[15] J.A.'s counsel made a complaint to TSH and will be following up with the Inspector General's Office because TSH has not responded to the complaint.

THE WITNESS: A. Yes, sir. I mean, like, she has been in restraint several times. She has verbally and physically assaulted clients and other staff. (RR 27:20-25)

MR. WATKINS: Q. Could you tell the court a little bit about why you say she harms herself?
THE WITNESS: A. I mean, like, she had episodes of scratching herself, breaking pieces of tile, breaking pieces of the wooden door. Again, I witnessed, myself, that incident when she told another client to go there and to break the light cover itself, which was on April 6. I was the one on call. (RR 36:14-21)

MR. WATKINS: Q. When she does those behaviors, do you believe those are suicidal ideations or attempts? Or is it less than that, she just wants to harm herself for some reason?

THE WITNESS: A. It's merely of like self-injurious behavior.
THE WITNESS: So she's harming herself, but not the way to kill herself.
MS. MONTOYA: Not trying to kill herself?
THE WITNESS: No. (RR 37:12-15)

**Dr. El-Awady's Cross Examination-Self Harm:**

Q. (BY MS. MONTOYA) During the times that you said that Jocelyn tried to scratch herself, did you think she was trying to kill herself?
A. No, ma'am. (55:15-18)

**Dr. Sobin's Direct Examination-Self Harm**

MS. MONTOYA: Dr. Sobin, do you think that Jocelyn cuts herself for attention?
THE WITNESS: That might be partially so.

MS. MONTOYA: Q. Do you think she's intending to kill herself? (RR 68:22-23)
THE WITNESS: A. I don't believe so.

MS. MONTOYA: Q. So if she was released today, do you think that she would go out and harm herself somehow? (RR 68:25)
THE WITNESS: A. Of course, I haven't been taking care of her for seven months, but from her past history, I think it is possible.
MS. MONTOYA: Q. But not likely?
THE WITNESS: A. I don't think so. (RR 69:1-6)

**Conclusion**

Dr. El-Awady testified that J.A. is self-harming, but not trying to kill herself. Dr. Sobin's testified that J.A.'s is self-harming partially for attention not, but does not think it is likely J.A. would harm herself if released. The State offered no evidence of specific facts and dates of when J.A. allegedly committed the acts Dr. El-Awady testified. There was no testimony of any thoughts of suicide or suicide attempts. There is inadequate testimony that J.A. committed a recent overt act or pattern of behavior that tends to confirm "to some degree probative of a finding that serious harm to herself is *probable* if she is not treated." Therefore, the State failed to prove by clear and convincing evidence that J.A. is likely to harm herself if not treated and the trial court erred in making that finding and this Court should reverse the trial court's decision.

47

## C.    Issue Three.

**The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness cause *serious harm to others* because the majority of the expert's testimony regarding a recent act was inadmissible hearsay.**

**Applicable Statutory Law**

Before a person can be ordered confined to a hospital on a temporary basis, the State must prove by clear and convincing evidence that the proposed patient is mentally ill and also establish at least one of the criteria set forth in Texas Health & Safety Code §574.034(a)(2). Texas Health & Safety Code §574.034(a)(2) states as follows:

(a)  The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1)  the proposed patient is a person with mental illness; and
(2)  as a result of that mental illness the proposed patient:
    (A)  is likely to cause serious harm to the proposed patient;
    (B)  is likely to cause serious harm to others; or
    (C)  is:
        (i)  suffering severe and abnormal mental, emotional, or physical distress;
        (ii)  experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to

48

provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
(iii)  unable to make a rational and informed decision as to whether or not to submit to treatment.

Texas Health & Safety Code §574.034(d) states as follows:

(d)  To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:
(1)  the likelihood of serious harm to the proposed patient or others;  or
(2)  the proposed patient's distress and the deterioration of the proposed patient's ability to function.

TEX. HEALTH & SAFETY CODE §574.034(d)

**Applicable Case Law**

J.A. can only be involuntarily committed to TSH if the State proves by clear and convincing evidence that J.A. is mentally ill and also establish at least one of the additional criteria set forth in section 574.034(a)(2). *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2).  In accordance to Texas Health & Safety Code 574.034(b), the State must present evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: the likelihood of serious harm to the proposed patient.  The Texas Supreme Court in *State v. K.E.W.,* 315 S.W.3d 16, 24, 53 Tex. Sup. Ct. J. 969, 2010 WL 2635981 (Tex. 2010) held that the expressed standard requires that the overt

act or pattern of conduct be "to some degree probative of a finding that serious harm to others is *probable* if the person is not treated."

Expert testimony confirming mental illness, standing alone, will not support an involuntary commitment. *In re B.A.*, 2016 WL 4628106, at *3 (Tex. App.–Tyler Sept. 7, 2016, no pet.) (mem. op.); *see T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.–Dallas 1999, no pet.). The *Tyler Court of Appeals* stated "An expert opinion recommending commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria. What is necessary is the expert's description of the patient's specific behaviors on which the expert's opinion is based." *State for B.A.,* 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) (*Citing J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App—Houston [1st Dist.] 2005, no pet) *See also, State for A.K.,* 2018 WL 1181055, at *4 (Tex. App.—Tyler Mar. 7, 2018, no pet.); (*State for G.H.,* 2018 WL 345788, at *7 (Tex. App.—Tyler Jan. 10, 2018, no pet.); *State ex rel. S.K.*, 2013 WL 1867626, at *3 (Tex. App.—Texarkana May 3, 2013, no pet.); *State ex rel. C.B.,* 12-11-00089-CV, 2011 WL 3918686, at *4 (Tex. App.—Tyler Sept. 7, 2011, no pet.).

**Facts**

Dr. El-Awady was the State's only witness at J.A.'s hearing. (RR 1-64) Dr. El-Awady's testimony was nothing more than describing how any child would react that has been in and out of CPS's custody and abused and neglected by the people who were charged with protecting her from being repeatedly raped, and then blaming her for not doing more to prevent the rape. RR )[16] Dr. El-Awady's testimony about a recent act or pattern of behavior did not include specific facts and dates of when the alleged acts occurred. Most of Dr. El-Awady's testimony was not in his personal knowledge and in admissible hearsay and therefore should not have been considered by the court.

**Dr. El-Awady's Direct Examination- Harm to Others:**

VOIR DIRE EXAMINATION
BY MS. MONTOYA:
Q. Dr. El-Awady --
A. Yes, ma'am.
Q. -- have you seen any personal outbursts with --
A. Yes, ma'am.
Q. Okay. When did you see that?
A. I was involved in at least some of the personal holds and physical restraints of the patient. The first one was on February 7th. She started fighting with the staff. She was placed in a physical hold. I was called to the unit to do the face-to-face. And I witnessed that myself. (RR 19:1-12)

---

[16] The therapy notes received from TSH for treatment between January 2019 through March 2019 indicated absolutely no treatment for the rape other than a notation in January 2019 by Dr. Kennedy that said "J.A. regrets not doing more to prevent the rape."

*Dr. El-Awady gives no details about what the "fighting"[17] was about, this could merely be a heated disagreement that escalated where staff decided to restrain to neutralize the situation. And while he testified that he "witnessed that myself", he stated first that she was in a physical hold AND was called to the Unit, which indicates he arrived after the incident, which also explains why he could give no other details about the incident.*

A. The second incident was on February 27. She started getting angry, flipping chairs, pulling down the curtains, threatening staff. She, again, was placed in a physical hold after she was told that she's not going to be having any coed kind of evaluation with other -- like, when male and female patients have same activities together.
Q. And you witnessed all of those?
A. Yes, ma'am. I was called in to do the face-to-face after the physical restraint.
Q. I'm sorry. Did you say after the physical restraint?
A. Yes. But I also witnessed her flipping the tables and the chairs.
A. And on April 6, I was the doctor on call that weekend. And I was called to the unit, and I witnessed her having verbal threats toward the staff -- (RR 19:13-25; RR 20:1-3)

Q. So your last personal knowledge of her fighting or verbal threats is April 6, 2019, correct?
A. Yes. I witnessed personally. (RR 20:12-14)

*Dr. El-Awady gives no details about what how J.A. was "threatening staff" he testified that he witnessed all of those specific acts, but then says he was called in AFTER the physical restraint. And according to his own testimony, physical restraints are not done until after J.A. acts out. (RR 52:19-25) Therefore Dr. El-Awady has no personal knowledge of what happened prior to him arriving on the Unit and observing J.A. flipping tables and chairs.*

---

[17] Merriam-Webster Dictionary defines "fight," *inter alia*, as a verbal disagreement or physical combat.

MS. MONTOYA: Your Honor, I would just say that, I would ask the court not to let Dr. El-Awady to discuss, in general, about fights that happened after April 6, 2019. (RR 20:22-25)

THE COURT: Okay. That's overruled. And you may continue.

Q. What are the symptoms of disruptive mood dysregulation disorder that are most prevalent in juvenile patients?
A. Usually the anger outbursts that is out of proportion for the provoking events itself. These anger outbursts occur on frequent basis. Usually they do not take responsibility for their action afterwards. In between these episodes, I mean, like, their mood is mainly irritable and angry as a baseline. (RR 22:8-18)[18]

MR. WATKINS: Q. In your opinion as a result of the mental illness, is the patient likely to cause serious harm to others?

A. Yes, sir. There's evidence by the several restraints she's been in and physical hold, at least seven of them. Some of the staff has been physically harmed, and so one of them, at least, ended up in the emergency room. (RR 28:7-14)

Q. What were the circumstances of the admission?
A. She was transferred from Waco residential treatment center on a 90-day commitment and medication petition. Apparently, she assaulted a staff member over there.
MS. MONTOYA: Objection, Your Honor. I need to take him on voir dire. I don't think he was in Waco to see the child assaulted anybody. (RR:23-12)
MS. MONTOYA: I would just say under Texas Rules of Evidence 803, Your Honor, that it does not meet the exception that Mr. Watkins has just said. It needs to be to describe medical history, past or present symptoms or sensations, their inception or their general cause. (RR 24:8-13)

---

[18] It should be noted that the Diagnostic Statistical Manual 5(DSM5) that is written by the American Psychiatric Association, has mandatory criteria that must be met in order for a patient to be diagnosed with DMDD and "not taking responsibility for their actions" is not a symptom of DMDD in the DSM5. Further, the symptoms must be observed in at least 2 settings. See Appendix A.

MS. MONTOYA: Did you overrule my objection, Your Honor?
THE COURT: It is overruled. (25:4-7)


MR. WATKINS: Q. When did that occur? Was it a staff member that ended up in the emergency room?
A. Yes, sir.
MR. WATKINS: Q. Could you tell the court the circumstances of that?
A. Patient got in a fight and **staff intervened.**
MS. MONTOYA: Objection, Your Honor. I don't know that he was there.
THE WITNESS: I wasn't there.
MS. MONTOYA: I don't think he has personal knowledge of that information.(RR 28:15-25)

*After admitting Dr. El-Awady did not have personal knowledge, the Judge still allowed Dr. El-Awady to testify to the facts of the same incident was inadmissible hearsay evidence and the Judge should not have considered that evidence in making his ruling:*

Q. So you had testified that there's a member of the Terrell State staff who was sent to the emergency room?
A. Yes, sir.
Q. Could you tell the court more about the circumstances as you understand them about that incident?
MS. MONTOYA: Your Honor, I'm going to
renew my objection that it's hearsay under there's no exception.
THE COURT: Okay. It's overruled. You can you answer the question.

*The Judge erred in considering Dr. El-Awady's testimony in his ruling because it was hearsay and not admissible evidence.*

THE WITNESS: Yes, sir.
A. On April 1st, 2019, the patient was placed in the chair restraint for aggression. She received emergency medication during that time. PNA was injured and had to go to ER for leg injury.

cursing and getting physically assaultive, her ability to tolerate frustration, her ability to follow the rules, not passing notes to other male clients or hugging and kissing them. (RR 32:10-25;RR 33:1-2)

MR. WATKINS: Q. So for a patient, specifically, Jocelyn, what do you look for when you're trying to monitor for improvement and see if she's improving?
A. The -- the diminishing of the anger outburst, if she gets upset and angry to be able to use more appropriate coping skills other than cursing and getting physically assaultive, her ability to tolerate frustration, her ability to follow the rules, not passing notes to other male clients or hugging and kissing them. Usually it's mainly the behavior and how the patient conduct themselves. (RR 30:11-21)

**Dr. El-Awady's Cross Examination-Harm to Others:**

Q. So from April 7th, when she got off of TSP until April 21st, she did not have any fights or angry outbursts; is that correct?
A. No, ma'am. She was just redirected about taking other client's food and she was ignoring staff (RR 47:23-24)

Q. Okay. And do you recall when she had a visit with her Great-Aunt Lou?
A. She usually come and visit on the weekends.
Q. Okay. If I told you that she came on Saturday and Sunday, Easter weekend, would that sound right to you?
A. I would believe you, ma'am.
Q. Okay. So that was Saturday and Sunday, would have been the 20th and 21st, correct? (RR 48:7-15)

Q. So immediately after seeing her great-aunt, she got into a fight; is that correct?
A. I don't see -- I mean, like, it was immediate or not. It was the next day.

Q. The next day. So the next day after seeing her aunt, she got into a fight. After being good for about 16, 17 days?
A. I mean, like, if you want to make that correlation time-wise, I guess the answer would be yes. (48:21-25;49:1-4)

So from April 22nd until April 29th, we can agree that Jocelyn had to be redirected, correct?
A. Uh-huh.
Q. But she got into no fights, did she?
A. No. (RR 49:10-14)

Q. Okay. And then she saw her great-aunt on Sunday the 29th.
Q. 28th, I apologize?
A. Yes, thank you.
Q. And then on the next day, Monday the 29th, did Jocelyn get into a fight?
A. Yes, ma'am. (RR 49:15-25)

 Jocelyn that it states that because of her previous sexual abuse that she should not be restrained unless absolutely necessary?
A. Yes, ma'am.
Q. Why is that?
A. Why is that what?
Q. Why would you make that order that she shouldn't be restrained because of the sexual abuse?
A. Well, it's part of the criteria here. I mean, like, the -- the part of evaluation, the restraint can be ordered except there is history of physical or sexual abuse because it can have more trauma to the patient. (52:1-13)

Q. Okay. And isn't it true that Jocelyn has -- her fight on April 22nd and on April 29th was with McKenzie?  (RR 54:24-25)

Q. Okay. And isn't it true that McKenzie is almost 18 years old?
A. I don't think I can discuss other clients here right now without breaking HIPAA regulation. (54:5-8)

THE COURT: Do you have any objections to that?

56

MR. WATKINS: I would start just by objecting to relevance (RR 54:17-18)

THE COURT: Explain to me, Ms. Montoya, why you need that information, why that's relevant?
MS. MONTOYA: Your Honor, because the two fights that Jocelyn had, McKenzie is much older than her and is about to get out. And Jocelyn had been doing so well, and McKenzie was jealous is my theory on this because she started these fights with -- and I think it's important for the court to know that an almost 18-year-old was picking on a 14-year-old. (RR 55:1-7)

THE COURT: Okay. I don't think it's relevant.
MS. MONTOYA: Okay.
THE COURT: And I'm going to sustain your objection. And let's move on to the next question. (55:8-12)

*The trial court erred by not considering the evidence regarding a much older person picking on a 14-year-old child[19], because J.A. was protecting herself, which has more than likely become instinctual because of her long history of abuse.*

**Law Applied to Facts**

Dr. El-Awady's testimony focused on the fact that J.A.'s angry outbursts were "disproportionate to the provocation" in general terms. (RR 22:-25) Dr. El-Awady attempts to give one example " I mean, like, the response to the anger is beyond that provocation itself. If somebody called her a name, then she would hit them, you know, with a closed fist punch." (RR 42:5-8) However, it is unclear if he is giving a hypothetical or describing an actual

---

[19] At the time of the hearing McKenzie was 17 and J.A. was 13.

event. Even if Dr. El-Awady is describing an actual event, he makes no mention of what name J.A. was called or the date she might have hit someone.[20] (RR 42:5-8) The Tyler Court of Appeals stated "what is necessary is the expert's description of the patient's specific behaviors on which the expert's opinion is based." *State for B.A.,* 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) When J.A.'s counsel attempted to provide the Court with evidence of reasons why J.A. might be aggressive and fighting, the Judge ruled the evidence as not relevant. (RR 56:21-25)

The incidents on February 7th and 27th[21], Dr. El-Awady testified "I witnessed myself," but when he discusses both incidents, Dr. El-Awady states "she was fighting with staff" "she was threatening staff" and "I was called to the Unit." If Dr. El-Awady had been there personally to witness these alleged incidents, it would seem logical that his testimony would be "she was fighting with me and the staff and she was threatening me and the staff". Even if the Court finds Dr. El-Awady had personal knowledge of these two incidents, there is no detailed facts of what occurred on February 7th and 27th would not be considered a recent act as required by the statute.

---

[20] One might argue this is typical behavior of teenagers.
[21] It is unclear what year Dr. El-Awady was referring, but for argument sake, J.A.'s counsel is assuming it was 2019, but leaving that determination to the Court.

The April 1, 2019 incident, Dr. El-Awady did not have personal knowledge of what happened that day, but the Judge overruled J.A.'s counsel hearsay objection. Dr. El-Awady testified that the "patient got in a fight and staff intervened." Was J.A. was being "picked on" by McKenzie and protecting herself? Did the "other patient" involved in the fight hurt the staff member? Did the staff member hurt herself in executing her duties? There was no testimony regarding criminal charges being filed against J.A. There was no testimony that J.A. intentionally hurt the staff member. The Texas Supreme Court held that the expressed standard requires that the overt act or pattern of conduct be "to some degree probative of a finding that serious harm to others is *probable* if the person is not treated." The fact that J.A. was involved in a fight does not meet the clear and convincing threshold that J.A. is likely to cause harm to others if not treated.

J.A. was placed on TSP beginning April 2, 2019 where she spent 12 hours a day in her room with very few breaks. (RR 44:14-25; 45) **J.A. had no "fighting" or "hurting" anyone from April 2, 2019 until April 22, 2019, twenty days.**[22] (RR 47:3-7; 48:21-25; 49:1-4) The only incident reported between those dates was in Dr. El-Awady's testimony during voir dire

---

[22] During Dr. El-Awady's cross examination, J.A.'s counsel inadvertently forgot to include the days of no incidents while J.A. was on TSP.

examination. (RR 20:3-8) Dr. El-Awady testified that April 6, 2019, "she made verbal threats to staff." (RR 20:3-8) Dr. El-Awady did not make specific statements regarding those "verbal threats," but since J.A. was released from TSP on April 7, 2019, it appears the "verbal threats" were not threats to harm anyone. (RR 46:19-21)

The guardian, Guardian, great aunt, Lou Autry, came to visit the child on April 21, 2019, and on April 22, 2019, J.A. was involved in a fight with McKenzie, who is 4 years older than J.A. (RR 48:21-25;49:1-4) (RR:70:11-14) J.A. had no "fighting" or "hurting" anyone from April 23, 2019 until April 29, 2019. (RR 48:21-25;49:1-4) The guardian, Guardian, great aunt, Lou Autry, came to visit the child on April 28, 2019, and J.A. got into a fight with McKenzie on May 29, 2019.[23] Both incidents on April 22, 2019 and April 29, 2019, there was no testimony that anyone was harmed so it is unclear if the "fights" were verbal or physical.[24] The Texas Supreme Court held that the expressed standard requires that the overt act or pattern of conduct be "to some degree probative of a finding that serious harm to others is *probable if the person is not treated.*" The fact that J.A. was involved in two fights be-

---

[23] J.A.'s counsel attempted to present evidence that McKenzie was jealous that J.A. could be getting out of TSH, but Judge sustained prosecutor's relevance objection. (RR55:1-7)

tween April 2, 2019 and May 2, 2019, with another teenager, who is also locked up in TSH, when no serious harm was caused, does not meet the clear and convincing threshold that J.A. is likely to cause harm to others if not treated. The trial court erred.

**Conclusion**

J.A.'s behavior described in the Reporter's Record is not indicative of a mentally ill child that is likely to cause serious harm to others. Instead, J.A.'s behavior is indicative of a child that has been abused and neglected the majority of her life. The trial court erred and this case should be reversed.

**D. Issue Four.**

> **The evidence was legally and factually insufficient to support the trial court's finding, by clear and convincing evidence, that J.A. would, as a result of mental illness, (i) continue to suffer severe and abnormal mental, emotional, or physical distress; (ii) continue to experience substantial mental or physical deterioration of the proposed patient's ability to function independently, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.**

**Applicable Statutory Law**

Before a person can be ordered confined to a hospital on a temporary basis, the State must prove by clear and convincing evidence that the proposed patient is mentally ill and also establish at least one of the criteria set

61

forth in Texas Health & Safety Code §574.034(a)(2). Texas Health & Safety Code §574.034(a)(2) states as follows:

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is a person with mental illness; and
(2) as a result of that mental illness the proposed patient:
    (A) is likely to cause serious harm to the proposed patient;
    (B) is likely to cause serious harm to others; or
    (C) is:
        (i) suffering severe and abnormal mental, emotional, or physical distress;
        (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
        (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

**Applicable Case Law**

J.A. can only be involuntarily committed to TSH if the State proves by clear and convincing evidence that J.A. is mentally ill and also establish at least one of the additional criteria set forth in section 574.034(a)(2). *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2). In accordance to Texas Health & Safety Code 574.034(b), the State must present evidence of a re-

cent overt act or a continuing pattern of behavior that tends to confirm: the likelihood of serious harm to the proposed patient. The Texas Supreme Court in *State v. K.E.W.,* 315 S.W.3d 16, 24, 53 Tex. Sup. Ct. J. 969, 2010 WL 2635981 (Tex. 2010) held that the expressed standard requires that the overt act or pattern of conduct be "to some degree probative of a finding that serious harm to others is *probable* if the person is not treated."

Expert testimony confirming mental illness, standing alone, will not support an involuntary commitment. *In re B.A.*, 2016 WL 4628106, at *3 (Tex. App.–Tyler Sept. 7, 2016, no pet.) (mem. op.); *see T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.–Dallas 1999, no pet.). The *Tyler Court of Appeals* stated "An expert opinion recommending commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria. What is necessary is the expert's description of the patient's specific behaviors on which the expert's opinion is based." *State for B.A.,* 2016 WL 4628106, at *3 (Tex. App.—Tyler Sept. 7, 2016, no pet.) (*Citing J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App—Houston [1st Dist.] 2005, no pet) *See also, State for A.K.,* 2018 WL 1181055, at *4 (Tex. App.—Tyler Mar. 7, 2018, no pet.); (*State for G.H.,* 2018 WL 345788, at *7 (Tex. App.—Tyler Jan. 10, 2018, no pet.); *State ex rel. S.K.*, 2013 WL 1867626, at *3

(Tex. App.—Texarkana May 3, 2013, no pet.); *State ex rel. C.B.,* 12-11-00089-CV, 2011 WL 3918686, at *4 (Tex. App.—Tyler Sept. 7, 2011, no pet.).

**Facts**

Dr. El-Awady was the State's only witness at J.A.'s hearing. (RR 1-64) Dr. El-Awady's testimony was nothing more than describing how any child would react that has been in and out of CPS's custody and abused and neglected by the people who were charged with protecting her from being repeatedly raped, and then blaming her for not doing more to prevent the rape. RR )[25](RR 56:14-25; (RR 61:20-25) (RR 62:1). And shortly thereafter, J.A. was mistreated in TSH in that she was required to sit in a chair for 12 hours during "TSP punishment" on several occasions.[26] Dr. El-Awady's testimony about a recent act or pattern of behavior did not include specific facts and dates to prove that the alleged acts are recent. Most of Dr. El-Awady's testimony was not within his personal knowledge and in admissible hearsay and therefore should not have been considered by the court.

---

[25] The therapy notes received from TSH for treatment between January 2019 through March 2019 indicated absolutely no treatment for the rape other than a notation in January 2019 by Dr. Kennedy that said "J.A. regrets not doing more to prevent the rape."

[26] J.A.'s counsel made a complaint to TSH and will be following up with the Inspector General's Office because TSH has not responded to the complaint.

## Dr. El-Awady's Direct Examination

Q. If the patient were not treated, do you
believe that she would continue to suffer severe,
abnormal, mental, emotional, or physical distress?
A. Yes, sir.
Q. If the patient's not treated, do you believe
her ability to function independently would deteriorate
due to her mental illness?
A. Yes, sir.
Q. In what way would her ability to function
independently deteriorate?
A. I mean, like, she would continue to suffer
chronic and severe mental illness. She would continue
to have anger outburst, poor impulse control, self-harm
and potential -- and harming others. (RR 35:6-19)


Q. And if she -- do you believe she's adequately
able to care for herself at this time?
A. Not in her current condition, sir.
Q. Why do you believe that?
A. I mean, like, she continues to have poor
frustration tolerance. I mean, like, poor frustration
tolerance, she resolves to acting out as a defense
mechanism versus other -- other -- more appropriate
coping skills. She has been harming herself and
harming others.(RR 36:4-13)


Q. (BY MR. WATKINS) In terms of her hygiene,
diet, is she able to take care of herself in those
ways?
A. Yes, sir. (RR 37:17-20)


Q. In your opinion, is the patient able to make
rational, informed decisions about submitting to

65

treatment?

A. Not in her current condition, sir. (RR 37:21-24)

**Law Applied to Facts**

Dr. El-Awady was the State's only witness at J.A.'s hearing. (RR 1-64) Dr. El-Awady's testimony was nothing more than attesting to the statutory requirements, which is not enough evidence to meet their burden by a clear and convincing standard that J.A. continues suffer severe and abnormal mental, emotional or physical distress and will continue to experience deterioration of the ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. *State ex rel. S.W., 356 S.W.3d 576 (2011)* What is specifically lacking in the present case was any evidence of an overt act or continuing pattern of behavior that would generally affect J.A.'s ability to function independently on a day-by-day basis without the imposition of court-ordered mental health services. *Broussard v. State*, 827 S.W.2d 619, 622, 1992 WL 63150 (Tex. App.—Corpus Christi 1992, no writ)

**Conclusion**

J.A.'s behavior described in the Reporter's Record is not indicative of a mentally ill child that continues suffer severe and abnormal mental, emotion-

66

al or physical distress and will continue to experience deterioration of the ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. Instead, J.A.'s behavior is indicative of a child that has been abused and neglected the majority of her life. The trial court erred in making that finding and this Court should reverse the trial court's decision.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for all the reasons alleged and briefed herein, Appellant J.A. prays that this Court:

- reverse the trial court's decision and render an order to immediately release J.A. or remand

Appellant J.A. further requests that this Court grant her such other relief, both general and special, at law or in equity, to which she may show herself to be justly entitled.

Respectfully submitted,

**Montoya & Wyble Law, PLLC**
408 W. Nash
Terrell, Texas 75160
Phone: 972-524-3344
Fax: 972-563-6699

/s/ **Tina H. Montoya**
Tina H. Montoya, SBN 24039319
tina@montoyawyblelaw.com
Attorney for Appellant

**CERTIFICATE OF COUNSEL REGARDING WORD COUNT**

Pursuant to Texas Rule of Appellate Procedure 9, I certify the word count in this Appellant's Brief, excluding the portions allowed under the rule **totals 13,795 words**.

**/s/Tina H. Montoya**
**Tina Hall Montoya**

**CERTIFICATE OF SERVICE**

This is to certify that pursuant to Texas Rule of Appellate Procedure 6.3, a true and correct copy of this Appellant's Brief has been forwarded to on June 16, 2019:

Clay Watkins
Kaufman County District Attorney's Office
100 W. Mulberry
Kaufman, Texas 75142
Clay.Watkins@kaufmancounty.net

**/s/Tina H. Montoya**
**Tina H. Montoya**